Marjati WINARTO, Plaintiff–Appellant,

v.

TOSHIBA AMERICA ELECTRONICS COMPONENTS, INC., Roger E.A. Taylor, Wayne Liem, Bill McKinley, Ron Birtch, Nancy Alexander, Defendants–Appellees.

No. 99–55448.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 11, 2000

Filed Dec. 21, 2001

Tyron J. Sheppard, Los Angeles, California, for the plaintiff-appellant.

Arthur F. Silbergeld, Proskauer Rose L.L.P., Los Angeles, California, for the defendants-appellees.

Before: B. FLETCHER, THOMAS, and WARDLAW, Circuit Judges.

Opinion by Judge BETTY B. FLETCHER; Partial Concurrence and Partial Dissent by Judge WARDLAW.

BETTY B. FLETCHER, Circuit Judge:

Marjati Winarto was laid off from her job with Toshiba America Electronic Components. She sued the company and some of her managers and co-workers in federal district court, raising claims of illegal retaliation, disability discrimination, and civil rights violations, among others. A jury returned a verdict in favor of Winarto; awarded her $93,000 in compensatory damages; and found that the liable defendants had acted with oppression, fraud, or malice; but deadlocked as to the amount of punitive damages. After the verdicts were returned, the district court granted defendants' Rule 50(a) motion for judgment as a matter of law, set aside all verdicts that favored Winarto, and denied Winarto's motion for a new trial as moot. We reverse and reinstate part of the jury's verdict for compensatory damages and reinstate the jury's finding that defendants acted with oppression, fraud, or malice, and remand for a new trial to determine whether Toshiba is liable for punitive damages and on the amount of punitive damages due from defendants. We sustain the district court's vacation of the jury's finding of disability discrimination.

## I. Factual History

In March 1992, Marjati Winarto ("Winarto"), a woman of Indonesian ancestry, began working for Toshiba America Electronic Components ("Toshiba") as a Personal Computer ("PC") Support Analyst in the Management Information Systems Department ("MIS"). She was well qualified for the job; she held degrees in relevant fields and was more experienced as a computer programmer than most of the other members of the PC group.

Roger Taylor ("Taylor") became Winarto's supervisor shortly after she was hired. Soon thereafter, Winarto reported to him that she had been harassed by a co-worker, Ronald Birtch ("Birtch"). She complained that Birtch had called her a lesbian and a virgin in front of other co-workers. Taylor testified that in response to this complaint, he "took it on his own and it stopped."

In 1992, after managing Winarto for three months, Taylor completed Winarto's first performance evaluation and rated Winarto's overall performance as a 3.7 on a scale of 5. At the time of this evaluation, Winarto had not yet complained about discriminatory treatment or about other offensive conduct by Birtch.

Birtch continued to harass Winarto verbally, and he also undertook a disturbing physical form of harassment: kicking. Winarto testified that Birtch kicked her at work "many, many times." She complained orally to Taylor as early as 1993 that she had been kicked by Birtch in the presence of her co-workers; although Taylor reassured Winarto that this would stop, and, although Winarto thanked Taylor by email for helping her stop the kicking, Winarto later testified that the kicking "never cease[d]."

Winarto also testified that, one day in 1992, Birtch followed her down the stairs and began to taunt, "Chick, you better walk faster or I am going to hurt you again." He tried to pass her while simultaneously blocking her from going down the stairs, causing her to trip and twist her

ankle. The ankle injury troubled her so much that it required surgery two years later.

Sometime in 1993, Winarto was transferred to another group and was placed under the supervision of Mark Royer ("Royer"). In the 1993 year-end review, Royer gave her an overall rating of 3.29. Royer's evaluation contained mixed praise and criticism. His overall conclusion was that Winarto "is a hard worker, a pleasure to work with, and an asset to the organization." In January 1994, after complaining to the Human Resources department ("HR") about problems with Royer, Winarto was transferred back to Taylor's group.

In 1994, Winarto began to complain again to Taylor about Birtch. She complained to him by email that Birtch had written "nasty things" about her and attributed incorrect sign-out times to her on a board in the office. After Winarto's complaint, the board was removed, and Winarto was moved down the hall and away from Birtch.

According to Winarto, the harassment by Birtch continued throughout her employment. Birtch called Winarto names such as "clueless," messed up her hair with his hands and grabbed handkerchiefs out of her pocket "on a regular basis." He mimicked her accent and continued to kick her. According to Winarto, when she reported Birtch's behavior to Taylor, he "thought that it was like funny or something. He doesn't really take it seriously."

In August 1994, Winarto was diagnosed with a back injury. A doctor wrote a note that sought to limit her lifting responsibilities, but despite this, her co-workers forced her to continue to move computers. As a result, she reinjured her back, which caused her to miss more work; the doctor

wrote a second note that was more restrictive than the first.

Winarto complained to Taylor about other members of the group besides Birtch. She complained that Wayne Liem, a co-worker and sometimes acting supervisor, harassed her about her back problems and derided her for being an "Asian woman." She testified that Taylor was present during one conversation when Bill McKinley, another co-worker, complained about the number of Asians employed by Toshiba. McKinley also used to harass her for being a woman, injured, and Asian. Winarto also testified that she had complained "all the way to the Human Resources" during this time period. Trial Tr. at 98–99.

After supervising Winarto throughout 1994, Taylor gave her an overall score of 3.04 in her year-end performance review, almost seven-tenths of a point lower than the rating he had last given her. In the 1994 performance evaluation, Taylor's comments focused on Winarto's need to become a better team player. He gave the low rating despite noting the good work Winarto had done on a phone directory project; Taylor admitted at trial that the project was very important and that Winarto had done a good job on it.

On December 22, 1994, Winarto took medical leave to have surgery on her ankle from which she returned on or about March 20, 1995, approximately eleven days before she was laid off.

In January 1995, in response to declining profits, Toshiba began to consider eliminating some jobs. Mr. Suboni ("Suboni"), the Vice President of MIS, called for the elimination of one position within MIS as part of the downsizing effort. Taylor proposed Winarto for layoff, and, before any final decisions were made,

Carol Trubey ("Trubey"), a supervisor of employee relations in HR, conducted a "Reduction In Force" ("RIF") analysis. Trubey looked at the ratings of Winarto and various employees, their skills, importance to the company, and ages in order to ensure Winarto was an appropriate candidate for lay-off and that there was no discrimination in the decision. As part of the RIF review, Trubey looked at the most recent evaluation scores of the members of Taylor's team: Bill McKinley (3.67), Birtch (3.56), Chuck Struckel (3.62), and Winarto (3.04).

Soon after Trubey completed the RIF analysis, in March 1995, Winarto filed two written complaints in response to her 1994 performance evaluation, which she had received while on medical leave. In these complaints she alleged that she had been discriminated against and harassed by Taylor and several other co-workers and managers because she was a woman, a minority, and had suffered injuries that kept her away from work. Once Toshiba's management received Winarto's complaints, they postponed the decision to terminate her pending an investigation. Trubey investigated the complaints; she spoke with each of the people listed in the complaints, and ultimately concluded that she could not "substantiate [Winarto's] allegations of harassment and discrimination." At that point, Trubey, Linda Martin (another supervisor), and Suboni determined that they would go forward with the layoff.

In March, Toshiba terminated six individuals: Winarto was the only non-Caucasian laid off at that time; four of those terminated were women.

## II. Procedural History

Winarto sued Toshiba, Taylor, Birtch, and three other Toshiba employees in federal district court. In her first amended complaint she asserted claims for (1) discrimination and harassment based on race, sex, and national origin in violation of Title VII and the California Fair Employment and Housing Act ("FEHA"); (2) discrimination and harassment based on disability in violation of the FEHA; (3) retaliation for making complaints of discrimination and harassment in violation of Title VII and the FEHA; (4) violation of her civil rights as defined in California Civil Code sections 51.7, 52(b) and 52.1; (5) discrimination and harassment in violation of the California Constitution, Article I, Section 8; (7) termination in violation of public policy; (8) discrimination in violation of the Americans with Disability Act ("ADA"); and (9) negligence. The claims based on Title VII, the California Constitution, termination in violation of public policy, the ADA, and negligence were brought against Toshiba only. The other claims were brought against various combinations of the individual defendants.

The case was tried to a jury that returned a special verdict comprised of answers to twenty-six questions. The jury unanimously found that Toshiba and Taylor were liable for discriminating against Winarto based on her injuries, that Toshiba and Birtch were liable for "inflicting violence or intimidation in the workplace because of [ ] Winarto's race, national origin or sex," and that Taylor had aided and abetted in the infliction of violence. It also found that both Toshiba and Taylor terminated Winarto in retaliation for her complaints to Toshiba's HR. It found none of the defendants liable for discrimination or harassment based on sex, race, or national origin. It also found that Winarto did not suffer a disability that limited her ability to participate in major life activities. The jury unanimously awarded compensatory

damages of $93,000 and found that Toshiba, Taylor, and Birtch were guilty of malice, oppression or fraud in their conduct, and thus liable for punitive damages. However, the jury could not reach a verdict with respect to the amount of a punitive damages award.

During trial, defendants filed a motion for judgment as a matter of law that the district court took under submission; after the jury returned its verdict, Winarto moved for a new trial on punitive damages that was also taken under submission. Several months after the jury's verdict, the district court granted Defendants' motion for judgment as to all claims and denied Winarto's motion as moot. Winarto appeals.

### III. Standard for Rule 50(a) Judgment as a Matter of Law

■ We hold that the district court misapplied the standard of review for post-verdict motions for judgment as a matter of law ("JMOL"). The trial court can overturn the jury and grant such a motion only if, under the governing law, there can be but one reasonable conclusion as to the verdict. In other words, the motion should be granted only if "there is no legally sufficient basis for a reasonable jury to find for that party on that issue." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 149, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting Fed.R.Civ.P. 50(a)).

■ In ruling on a motion for JMOL, the court is not to make credibility determinations or weigh the evidence and should view all inferences in the light most favorable to the nonmoving party. *Reeves,* 530 U.S. at 150, 120 S.Ct. 2097 (citing *Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "[T]he court must accept the jury's credibility findings consistent with the verdict." *Bilbrey by Bilbrey v. Brown,* 738 F.2d 1462, 1468 n. 8 (9th Cir.1984). It "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves,* 530 U.S. at 151, 120 S.Ct. 2097. The court "may not substitute its view of the evidence for that of the jury." *Johnson v. Paradise Valley Unified Sch. Dist.,* 251 F.3d 1222, 1227 (9th Cir.2001).

### IV. Retaliation

Winarto claimed that defendants violated the anti-retaliation provisions of Title VII[1] and the California FEHA.[2] Both of these statutes prohibit employers from

1. Title VII provides that it is an

 unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.
 42 U.S.C. § 2000e–3(a).

2. California Government Code § 12940 (the California Fair Employment and Housing Act) makes it

 an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California: (h) For any employer, labor organization, employment agency, or person to discharge, expel, or otherwise discriminate against any person because the person has

taking adverse actions against employees who complain about discrimination and harassment at work.

### A. Pretext

■ On the special verdict form, the jury answered "yes" when asked: "Do you find by a preponderance of the evidence that defendant Roger Taylor terminated plaintiff Marjati Winarto in retaliation for her making a complaint to Toshiba's Human Resources department?" We find that the record, viewed in the light most favorable to Winarto, supports this finding, and we reverse the district court's holding to the contrary.

■ Under the burden-shifting scheme of Title VII and the FEHA, after the plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory explanation for the adverse employment action. *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 919 (9th Cir.1997); *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir.2000); *Guz v. Bechtel Nat'l, Inc.*, 24 Cal.4th 317, 354, 100 Cal.Rptr.2d 352, 8 P.3d 1089, 1113 (2000). If the employer rebuts the inference of retaliation, the burden of production shifts back to the plaintiff to show that the defendant's explanation is merely a pretext for impermissible retaliation. *Id.* Pretext may be shown either (1) directly by persuading the jury that a discriminatory motive more likely than not motivated the employer or (2) indirectly by showing that the employer's proffered explanation is unworthy of credence. *Godwin v. Hunt Wesson Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998). To establish pretext, "very little"

direct evidence of discriminatory motive is sufficient, but if circumstantial evidence is offered, such evidence has to be "specific" and "substantial." *Id.* at 1222; *Little v. Windermere Relocation, Inc.*, 265 F.3d 903, 915 (9th Cir.2001). An unwarranted reduction in performance review scores can constitute evidence of pretext in retaliation cases. *See Yartzoff v. Thomas*, 809 F.2d 1371, 1377 (9th Cir.1987); *cf. Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir.1994) (low marks satisfy prima facie case, but in this case were insufficient to prove pretext).

The district court erred by considering only the effect of Trubey's RIF analysis and by ignoring the evidence of Taylor's retaliatory motive for giving Winarto the poor evaluation. Taylor selected Winarto for lay-off and justified his decision, in large part, on those low evaluation scores. Trubey did not start from a clean slate with her RIF analysis, but instead used Taylor's selection of Winarto for lay-off and Winarto's low scores as her starting point. Trubey testified at trial:

Q: And did you review the performance reviews of anyone else [besides Winarto] in her department or her working group?

A: Not in great detail, because they were higher than hers, but I skimmed through them.

Q: They were higher than hers in what respect?

A: The overall rating. I would have just skimmed through to see if there were any concerns on the individual ratings, because the overall rating is reflected in an average score.

Trial Tr. at 502–03. Through her RIF analysis, Trubey verified that Winarto was

---

opposed any practices forbidden under this part or because the person has filed a com-

plaint, testified, or assisted in any proceeding under this part.

a justifiable choice, an appropriate candidate for lay-off, based on the premise that Winarto was the lowest scoring employee and one whose skills had declined.[3] Almost no evidence suggests that Trubey inquired into whether Taylor's 1994 evaluation was itself based on improper retaliatory or discriminatory motives.[4]

At trial, defendants offered very little evidence to show that Taylor's low scores were based on anything but retaliation. By contrast, Winarto offered substantial evidence of retaliation or evidence from which retaliation could be inferred, and sufficiently rebutted as pretext defendants' explanations for the low scores. The record supports the findings that (1) Winarto made complaints that were protected acts under Title VII and FEHA and (2) Taylor's low scores and negative comments in 1994 were given in retaliation for her complaints, and not for a legitimate decline in performance.

Winarto engaged in many acts protected by the antidiscrimination statutes that could have been the trigger for unlawful retaliation. The record is replete with proof of her many oral and written complaints to Taylor.[5] The record also contains evidence of her complaints to HR months and even years before her March 1995 complaint and before Taylor wrote the December 1994 evaluation.[6] Winarto testified that she had complained on several occasions to HR. *E.g.*, Trial Tr. at 98, 124, 155, 227. Birtch corroborated this testimony by noting that, when provoked, Winarto would often say "I'm going to HR," and that an HR employee talked to him after he called Winarto a lesbian. Winarto's many complaints were protected acts within the FEHA and Title VII, and any of these could have been the basis for an actionable claim of retaliation.

The record supports the conclusion that Taylor's evaluation was retaliatory. Although defendants sought to counter Winarto's evidence that the dramatically declining evaluations were unjustified, at best the evidence was conflicting; viewing the evidence in favor of Winarto, she was a good employee whose performance had not

3. The dissent characterizes the RIF analysis as if Trubey had independently confirmed that Winarto was the MIS department's least qualified and only replaceable employee. This may be the conclusion that the defendants wanted the jury to draw, but the jury did not. This conclusion, especially the assertion that every one of Winarto's co-workers had a "unique skill which made [them] irreplaceable" is simply unsupported in the record.

4. Trubey testified, in passing, that she "talked with [Taylor and another supervisor, Linda Martin] on at least a couple of occasions to understand [Winarto's] skills and her performance, and why there was a decline in her performance." Trial Tr. at 502. Trubey never elaborated on this statement or disclosed what she concluded about Winarto's decline. There is no other evidence in the record about what Trubey did, if anything, to scrutinize Taylor's low scores.

5. Although the jury's special verdict form asked whether the jury found "retaliation for her making a complaint to Toshiba's Human Resources department," the jury instructions elaborated that Winarto's theory relied on "complaints made *to her supervisor* and to Human Resources." Jury Instructions at 24 (emphasis added). Despite the dissent's suggestion to the contrary, the jury was never instructed or directed to focus on the March 1995 complaint.

6. The critical flaw undermining the dissent's analysis is to ignore this evidence to conclude that Winarto complained to HR only in March 1995. The only way to draw this conclusion from the record is to credit defendants' witnesses over Winarto's to resolve a direct conflict in testimony. This resolution turns our standard of review on its head.

deteriorated from 1992 to 1994. Nevertheless, Taylor's overall rating of Winarto fell from 3.7 (out of a possible 5.0) in 1992 to 3.04[7] in 1994, a drop of 17.8%. In 1992, Taylor gave Winarto 3.5's or 4.0's in the individual categories, while he gave her 2.8's and 3.0's (with one exception) in 1994, amounting to decreases in score from 14.3% to 30%.[8]

Furthermore, Winarto introduced substantial and specific evidence that Taylor's explanations were pretextual as both unworthy of credence *and* likely motivated by unlawful retaliation. *See Godwin*, 150 F.3d at 1220. For example, unlike the generally positive comments Taylor had made in 1992, some of Taylor's 1994 comments can be interpreted only to penalize Winarto for having made legally protected complaints. In 1994, Taylor noted that "she sometimes does not assume responsibility to help resolve conflicts." Taylor also implored Winarto "to become more involved in team efforts," and suggested she "improve teamwork with more participation and challenges." In contrast, in the 1992 performance review, Taylor had called Winarto an "excellent team player," and defendants offered no evidence to suggest that Winarto's teamwork skills had fallen off, or that the "responsibility to help resolve conflicts" comment reflected

anything but resentment for her many complaints.

■ As further support for the jury's findings, the record reflects Taylor's exasperation, lack of sympathy, and even animosity toward Winarto. Winarto testified that when she complained to Taylor that Birtch had mimicked her accent, Taylor laughed at her and did not take it seriously. In response to a doctor's note, Taylor became furious and said "if you cannot do all this what else can you do?" When she asked him a question on one occasion, Taylor looked at her rudely, angrily, and with such intensity that she almost "fell to the ground." Winarto testified also to Taylor's racial biases; she once heard him say that Toshiba "doesn't need any more Asians. Again, this is just Toshiba, what can we do about it?" The dissent chastises us for relying on this evidence, because it is "only evidence of her impressions." On the contrary, to ignore Winarto's testimony is to intrude on the province of the jury. Finally, as additional evidence of retaliatory motive, Winarto testified that Taylor stopped sending her to training seminars after she complained to him and HR.[9]

■ The dissent attacks our analysis by relying on the self-serving testimony of Birtch and Taylor, and, on some points,

---

7. A rating of 4.0 means the employee "consistently exceeds job requirements." 3.0 means that the employee is "fully effective, [and] meets all job requirements." 2.0 means "needs improvement or development." Even non-sub-average ratings can constitute an "adverse employment decision" if they are clearly undeserved or a large departure from past reviews. *See Yartzoff*, 809 F.2d at 1376 (emphasizing that it is "undeserved performance ratings, if proven, [that] would constitute [actionable] adverse employment decisions"); *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1117 n. 6 (9th Cir.2000) (Fisher, J. dissenting) (noting that scores need not be subaverage to constitute retaliation); *see also Little*, 265 F.3d at 914 (defining an "adverse employment action" as any adverse treatment

reasonably likely to deter the charging party or others from engaging in protected activity).

8. It matters not, as defendants suggest, that Winarto's manager in 1993, Royer, gave scores that were lower than the scores given by Taylor in 1992. The jury could conclude that a three for Royer meant something different than a three for Taylor. Furthermore, the jury could note that Royer's qualitative review of Winarto was much more positive than Taylor's review.

9. The dissent contends that Winarto "was not allowed to attend only those seminars for which she was unqualified or that focused on duties unrelated to her own." This statement is supported only by defense witness testimo-

evidence of defendants controverted by plaintiffs. The dissent disparages inferences a reasonable juror could draw by referring to them as "hypothesized causal links" as opposed to the inferences the dissent draws, which it characterizes as "legitimate inferences," even though inferences going both ways are supported by the record. When two sets of inferences find support in the record, the inferences that support the jury's verdict of course win the day.[10]

 The record abounds with specific and substantial circumstantial evidence to support the jury's finding of retaliation, and the district court erred when it held

that a rational trier of fact could not find evidence in the record of pretext and retaliation. *See Little*, 265 F.3d at 915 (finding that the temporal proximity of the events, the fact that the plaintiff had received only positive feedback prior to the adverse employment action, and the plaintiff's description of her direct supervisor's surprise at the adverse action sufficed to raise a genuine issue of fact as to pretext that the jury should resolve).[11]

### B. Individual Liability for Retaliation by a Supervisor

Because we reinstate the jury's finding of retaliation, we must address whether

---

ny that is contradicted by Winarto's testimony. It is the non-movant's evidence that we assume to be true. To resolve direct conflicts in testimony, the credibility of each side has to be weighed, and this is a task for the jury, not the trial judge, and not the appeals court. *Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir.1997); 9A Wright & Miller, Federal Practice & Procedure § 2527.

10. The dissent claims that *Clark County School District v. Breeden* precludes our drawing inferences of retaliation from the evidence presented to the jury. 532 U.S. 268, 121 S.Ct. 1508, 1510–11, 149 L.Ed.2d 509 (2001). In *Breeden*, the Supreme Court reinstated a district court's decision to grant summary judgment in favor of a defendant, defeating a claim of retaliation. The plaintiff's claim "relie[d] wholly on the temporal proximity" between the time plaintiff filed her lawsuit complaining of harassment and the time defendant revealed plans to transfer the plaintiff. Although there was uncontroverted evidence that the defendant was not aware of the lawsuit until after the transfer plans were revealed, we found that, because an EEOC right-to-sue letter was issued before the transfer was announced, a jury could reasonably infer that the transfer proposal made three months later was a reaction to the plaintiff's charge of harassment disclosed by the letter. However, the Supreme Court explained that, if the person who made the decision to transfer the plaintiff knew of the right-to-sue letter, then presumably she also knew almost two years earlier about the filing of the EEOC

complaint (the protected action) because Title VII requires that the employer be given notice within 10 days after the complaint is filed. Since so much time passed between the filing of the complaint and the transfer decision, the Supreme Court concluded that the evidence could not support a claim based on temporal proximity, and the plaintiff provided no other evidence of retaliation. As a result, any inference of retaliation was unreasonable.

In contrast, first off, the case before us is not a summary judgment review. We look to whether Winarto's evidence allowed the jury to draw a reasonable inference of retaliatory motive. Winarto's several complaints, any one of which or combination of which could have triggered Taylor's low evaluation of Winarto, closely preceded the evaluation. The evidence of timing of the events in this case and the evidence of Taylor's hostility toward Winarto could support a jury's reasonable inference that Taylor had a retaliatory motive. *Breeden* does not control this case.

11. Because the jury properly found that Toshiba retaliated against Winarto in violation of Title VII and the FEHA, it follows that Winarto was fired in violation of public policy. *See Green v. Ralee Eng'g Co.*, 19 Cal.4th 66, 75–80, 78 Cal.Rptr.2d 16, 960 P.2d 1046, 1051–54 (1998) (summarizing doctrine); *Blom v. N.G.K. Spark Plugs (U.S.A.), Inc.*, 4 Cal.Rptr.2d 139, 143, 3 Cal.App.4th 382, 389 (1992). Winarto's selection for termination rests on Taylor's low performance review, which the record supports as an act of retalia-

Taylor can be held individually liable for retaliation under the FEHA. The district court erred by holding that under the California Supreme Court case of *Reno v. Baird*, 18 Cal.4th 640, 76 Cal.Rptr.2d 499, 957 P.2d 1333 (1998), Taylor could not be individually liable for retaliatory termination.

The retaliation provision of the FEHA applies to "any employer, labor organization, employment agency, *or person*" Cal. Gov't Code § 12940(h) (emphasis added). "Person" in this section means, in part, "one or more individuals." Cal. Gov't Code § 12925(d). Giving these words their ordinary meaning, we conclude that the plain meaning of the statute is susceptible to only one interpretation: supervisors can be held liable for retaliation under section 12940(h) of the California Government Code.

In contrast, *Reno* focused on FEHA's discrimination provision, which prohibits only "an employer" from discriminating in hiring and employment decisions. Cal. Gov't Code § 12940(a). *Reno* focused on the absence of the word "person" in deciding that the discrimination provision does not extend liability to individual supervisors, 76 Cal.Rptr.2d 499, 957 P.2d at 1336–37, and is thus distinguishable.

Our holding is consistent with how the retaliation provision had been interpreted

by the lower California courts before *Reno* was decided. *See Page v. Superior Court*, 31 Cal.App.4th 1206, 37 Cal.Rptr.2d 529, 533 (1995) ("As to supervisors ... the language of FEHA is unambiguous in imposing personal liability for harassment or retaliation in violation of FEHA."); *Fisher v. San Pedro Peninsula Hosp.*, 262 Cal. Rptr. 842, 856, 214 Cal.App.3d 590 (1989) (implying that the 1987 amendment of the retaliation provision to add the word "person" indicates a legislative intent to extend liability to individuals). Every federal district court that has considered this issue since *Reno* has also concluded that *Reno* does not apply to retaliation. *E.g., Peterson v. Santa Clara Valley Medical Center*, 2000 WL 98262 (N.D.Cal.2000); *Soo v. United Parcel Serv., Inc.*, 73 F.Supp.2d 1126 (N.D.Cal.1999); *Liberto–Blanck v. City of Arroyo Grande*, 33 F.Supp.2d 1241 (C.D.Cal.1999); *Kaminski v. Target Stores*, 1998 WL 575097 (N.D.Cal.1998).

■ We conclude that an individual-supervisor may be held personally liable for retaliation under the FEHA. The district court erred insofar as it held otherwise.

## V. *California Civil Code §§ 51.7, 52(b), and 52.1*

■ The district court also reversed the jury's verdict as to the cause of action

---

tion for Winarto's complaints. Because the firing was premised on acts that (1) violated federal and state laws that (2) furthered some policy in the public interest that (3) were well established at the time of the discharge and (4) were substantial and fundamental, defendants are also liable for the California common law tort of wrongful discharge. *See* Cal. Gov't Code § 12940 ("The Legislature finds and declares that it is the existing policy of the State of California to prohibit harassment and discrimination in employment on the basis of any protected classification."); *Steven-*

son v. Superior Court, 16 Cal.4th 880, 889–90, 66 Cal.Rptr.2d 888, 941 P.2d 1157, 1161 (1997) (holding that age discrimination can be the basis for a wrongful discharge suit because it violates the public policy expressed in the FEHA); *Rojo v. Kliger*, 52 Cal.3d 65, 90–91, 276 Cal.Rptr. 130, 801 P.2d 373, 389 (1990) (finding public policy against sex discrimination embodied in state constitution to support a suit for wrongful discharge). We thus reverse the district court's grant of judgment as a matter of law on the cause of action for termination in violation of public policy.

based on California Civil Code Sections 51.7, 52, and 52.1. Because we find that substantial evidence supported the jury's verdict, we reverse.[12]

## A. Act of Violence

■ These are not "hate crimes" statutes. Section 51.7 provides that "[a]ll persons ... have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of their race, ... national origin, ... [or] sex." Cal. Civ.Code § 51.7.[13]

It may be true that this section and other similar California statutes were enacted "in response to [the] alarming increase in hate crimes." *Boccato v. City of Hermosa Beach*, 35 Cal.Rptr.2d 282, 29 Cal.App.4th 1797, 1809 (1994) (alteration in original). Nevertheless, there is no requirement that the violence be extreme or motivated by hate in the plain language of the sections, or in the cases construing them; there is also no requirement that the act constitute a crime. If the Califor-

nia legislature wanted to limit the reach of the statute to extreme, criminal acts of violence, it could have explicitly said so. What it did instead was create civil liability which sweeps more broadly than the common, colloquial meaning of the phrase "hate crime." Without clear evidence that the legislature intended otherwise, we will not disturb the plain meaning of the statute. *Lennane v. Franchise Tax Bd.*, 9 Cal.4th 263, 268, 36 Cal.Rptr.2d 563, 885 P.2d 976, 978 (1994).

■ Birtch committed violence against Winarto. It is established beyond dispute that Birtch kicked Winarto at least once. Winarto testified that Birtch kicked her or feigned kicking her on many other occasions.[14]

■ Not only did Birtch commit violent acts against Winarto, but he also threatened violence that was intimidating. *See* Cal. Civ.Code § 51.7. The test is: "would a reasonable person, standing in the shoes of the plaintiff, have been intimidated by the actions of the defendant and have perceived a threat of violence?"

**12.** The defendants have waived the argument that this cause of action is barred under the statute of limitations. On November 22, 1996, the district court ordered the defendants to file motions for summary judgment on any affirmative defenses that were purely questions of law, including any statute of limitations defenses. The order warned that "[f]ailure to file will be deemed a waiver of the respective affirmative defenses."

In response, the individual defendants filed two separate motions for summary judgment, and Toshiba filed a third. The individual defendants' motions failed to make any statute of limitations arguments. The district court's order of January 17, 1997 denying these two motions deemed that any statute of limitations defense was waived by these defendants.

Toshiba's separate motion for summary judgment did include a statute of limitations argument, but only with respect to Winarto's seventh cause of action, a claim of negligence. Toshiba consciously chose to limit its statute of limitations argument to one cause of action; the arguments with respect to the others are waived.

**13.** Section 52.1(b) provides a cause of action to any person who has been denied rights under the laws of California-presumably including § 51.7.

**14.** Birtch testified that his foot "glanced off" Winarto once by accident, and that he apologized orally when it happened and later in writing upon Taylor's direction. The dissent focuses on this testimony and concludes that Winarto was kicked only once. This improperly discounts Winarto's testimony of having been kicked many times.

Judge Donna J. Hitchens & Robert D. Links, *California Civil Practice: Civil Rights Litigation* § 3:4. Specifically, we focus on the reasonable woman. *Cf. Ellison v. Brady*, 924 F.2d 872, 879 (9th Cir. 1991) (using a reasonable woman test to decide whether sexual harassment creates a hostile environment).

In 1992, Birtch approached Winarto from behind in a stairwell, and threatened her, saying, "chick, you better walk faster or I am going to hurt you again." Winarto rushed down the stairs and injured her ankle so severely that she needed surgery two years later. Birtch tousled Winarto's hair and grabbed handkerchiefs out of her pocket on many occasions. After experiencing Birtch's acts of violence, including kicks, one of which Winarto described as being "very, very painful," it is reasonable that Winarto was intimidated by his later, less violent invasions of her personal space and unwanted touching.

### B. Animus

[19] The district court ruled that Winarto's claims failed because Winarto did not "offer any evidence whatsoever that Birtch's conduct was motivated by any animus towards Winarto because of her membership in a protected class of persons." Instead, the district court excused Birtch for having "acted immaturely, but not with any animus based on plaintiff's national origin, sex or any disability that she might have"; the dissent agrees. This holding is unsupportable because, taking the facts in the light most favorable to Winarto, a reasonable jury could find that Birtch was motivated in his violence by gender or national origin animus.[15]

 During the stairwell incident, Birtch derisively called Winarto "chick". Sometimes, just before he kicked her, he would say "I'm going to hurt you again, Chick." Trial Tr. at 55. At his deposition, Birtch admitted that the hair messing was a "girl thing" although he later recanted this statement and claimed to have messed with the hair of his male friends too. Birtch also mimicked Winarto's accent "very, very frequently." It is beyond dispute that Birtch singled out Winarto as the victim of his attacks. The circumstantial evidence supports the reasonable inference that he targeted Winarto, at least partly, because she spoke with an accent and because she was the only woman in his group, in other words that Winarto's gender and national origin were substantial motivating factors in Birtch's attacks. Thus, the court stepped outside its proper deferential role in granting JMOL.[16]

### VI. Disability Discrimination

 Although the jury found that Winarto did not have a disability that limited

---

**15.** It is unclear whether the statute requires bias to be the sole motivation, a substantial part of the motivation, or an incidental motivating factor. *California Civil Practice* § 3:6. However, we need not decide because under any of these standards, the jury could reasonably conclude that Birtch bore animus toward Winarto. Winarto's status may not be the only reason she was targeted, but the record supports the conclusion that it was at least a substantial factor.

**16.** The jury found also that Taylor and Toshiba were liable for the violence inflicted on Winarto by Birtch. The district court did not address Taylor's and Toshiba's liability separate from Birtch's liability. Nor do defendants argue on appeal that Taylor and Toshiba are somehow immune from this kind of liability. As a matter of law, Taylor can be liable for "aid[ing], incit[ing], or conspir[ing] in the denial" of Winarto's rights under Section 51.7. Cal. Civ.Code § 52(b). It follows that Toshiba can be liable for the acts of its agent. Furthermore, the records supports the jury's finding that Taylor and Toshiba aided Birtch in depriving Winarto of these rights.

her ability to participate in major life activities, it nevertheless found that Defendants Toshiba and Taylor were "liable for discriminating against plaintiff … based on her back injury, ankle injury or lifting restriction." We are unable to reconcile these two findings and therefore affirm the district court's ruling reversing the jury's verdict of disability discrimination. If the record supported the conclusion that Toshiba *perceived* Winarto to have been disabled, the jury's finding could be sustained. It does not. Under the FEHA,[17] a "physical disability" includes "being regarded or treated by the employer or other entity covered by this part as having or having had any physical condition that makes achievement of a major life activity difficult." Cal. Gov.Code. § 12926(k)(4). The jury was instructed that an employer's perception that an employee is disabled satisfies the "physical disability" requirement.

Although Winarto testified that she had told her managers about her temporary physical limitations, she introduced no evidence in the record to establish that her managers perceived her to be disabled. Given the temporary nature of Winarto's injuries and work restrictions, the fact that Toshiba had been given two notes from doctors was not enough to prove that Toshiba perceived Winarto to be disabled. Thus, the district court did not err in reversing the jury's verdict for disability discrimination under the FEHA. We affirm.

## VII. Punitive Damages

■ The jury on the special verdict form found "by clear and convincing evidence that" Toshiba, Taylor, and Birtch were "guilty of malice, oppression or fraud in the conduct on which [it] based [its] award for damages." A jury's finding that the evidence supports a punitive damage award should be affirmed if it is supported by substantial evidence. *Lambert v. Ackerley*, 180 F.3d 997, 1012 (9th Cir.1999) (en banc). We find that substantial evidence supports the jury's determination that all three defendants acted with sufficient culpability to expose themselves to punitive damages. *See, e.g., Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 514–516 (9th Cir.2000) (holding that the evidence of retaliation was "unquestionably sufficient" to satisfy the "malice or reckless indifference" standard for punitive damages under Title VII).

Toshiba seeks to limit its vicarious liability for Title VII punitive damages by invoking agency law principles as elaborated in *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 539–46, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). Because the district court issued its order before *Kolstad* was decided, it did not consider this defense. Although the parties have briefed the issue to this court, the facts have not been fully developed before the district court. Specifically, Toshiba should be given the opportunity to meet its burden of proof that it had an adequate anti-retaliation policy that was implemented in good faith. *See Passantino*, 212 F.3d at 516–17 (citing *Kolstad*, [527 U.S. at 544, 119 S.Ct. 2118]). The evidence in the current record suggests that the policy was not "fairly and adequately enforced." *Id.* at 517. Taylor testified at trial that when Winarto complained to him about being kicked by

---

**17.** Winarto brought disability discrimination claims under both the ADA and the FEHA. However, she has limited her arguments on appeal to the FEHA, and expressly distinguishes the ADA. We likewise limit our review to the claims under FEHA.

Birtch, he did not memorialize the complaint, nor did he believe that he had to report the complaint to HR. Furthermore, he testified that his supervisor, Linda Martin, told him when informed about the complaint that the simple warning he had given to Birtch sufficed. Birtch was not otherwise disciplined and the abusive conduct did not cease; in fact, Birtch continued to work for Toshiba at the time of the trial and had been promoted sometime after Winarto's departure. It seems on this record that Toshiba did not have a sufficient policy or at least one that was adequately enforced in handling Title VII complaints. *See Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1210 (10th Cir.2000) ("[T]o avail itself of *Kolstad's* goodfaith-compliance standard, an employer must at least adopt antidiscrimination policies[,] make a good faith effort to educate its employees about these policies," and "make good efforts to enforce" the policy.). Nevertheless, Toshiba should be given the opportunity to develop the record on this point.

Toshiba also contends that punitive damages are not recoverable against it under the FEHA and California Civil Code Section 52(b) unless an officer, director, or managing agent of the employer ratified or authorized wrongful conduct. Cal. Civ. Code § 3294; *Weeks v. Baker & McKenzie*, 74 Cal.Rptr.2d 510, 532, 63 Cal. App.4th 1128, 1147–48 (1998) (applying section 3294 to FEHA action). As with the *Kolstad* defense, the district court failed to reach this issue, and we decline to decide whether section 3294 applies without further development of the factual record.

On remand, the district court may consider evidence from the parties as to (1) whether Toshiba implemented an anti-re-taliation policy in good faith in order to determine whether Toshiba is entitled to invoke the *Kolstad* limit on vicarious liability; and (2) whether Toshiba ratified or authorized Taylor's wrongful conduct for purposes of deciding whether to apply California Civil Code section 3294. If there are material issues of disputed fact, the jury should decide Toshiba's liability under proper instruction. Regardless of whether Toshiba is liable for punitive damages, punitive damages are appropriate against Taylor and Birtch, and the amount thereof shall be determined by the jury.

## VIII. Conclusion

For the foregoing reasons, we reverse the district court's decision granting Appellee's motion for judgment as a matter of law on three claims: (1) retaliatory discharge; (2) termination in violation of public policy; and (3) California Civil Code §§ 51.7, 52, and 52.1. The district court's decision to reverse the jury's verdict is affirmed only with respect to the claim for disability discrimination.

Because we affirm the district court's reversal of the jury's finding of disability discrimination, we must decide whether the jury should recalculate Winarto's compensatory damages on remand. Winarto urged the jury to award lost wages of $39,000 per year, less the small amount she made working for other companies after she was fired, plus future compensation, plus $200,000 in damages for emotional distress. The damages awarded for lost wages were not specific to a particular cause of action; furthermore, based on the relatively small amount of compensatory damages awarded, as compared to the emotional distress damages claimed, it is evident that emotional distress damages caused specifically by dis-

ability discrimination would be *de minimis*. Accordingly, we reinstate the jury's entire $93,000 verdict.

We also reinstate the jury's determination of liability for punitive damages. Furthermore, Winarto's motion for a new trial on the amount of punitive damages is no longer moot and is granted. We remand for jury trial to determine whether Toshiba is liable for punitive damages and the amount of punitive damages as to all defendants.

Costs are awarded to the appellant.

AFFIRMED IN PART, REVERSED IN PART and REMANDED.

WARDLAW, Circuit Judge, concurring in part and dissenting in part:

First, I note my agreement with the majority on its reversal of the district court's grant of JMOL on Winarto's claims under California Civil Code §§ 51.7, 52(b), and 52.1, and with its affirmance of the district court on the FEHA disability claim. Where I part company with the majority is on its reversal of the district court's grant of JMOL on Winarto's claim of retaliatory discharge.

In 1995, Toshiba determined that a firm-wide reduction in force was necessary. Winarto was identified as one of the employees to be laid off because (i) her department would be required to lay off one employee and (ii) in the previous year, 1994, she received the lowest performance evaluation scores in her department. After she was so identified, but before the final decision was made, Winarto filed a written claim of race, national origin, and sex discrimination. Toshiba's Human Resources Department investigated the claim and found it meritless. Thereafter, on March 31, 1995, Toshiba notified Winarto that she would be among those laid off. The majority reverses the district court's grant of JMOL on Winarto's ensuing claim of retaliatory discharge, stating that the district court "misapplied the standard of review of post-verdict motions for" JMOL.

I disagree. Not only did the district court recite the correct standard for rendering JMOL under Rule 50, but, unlike the majority, it actually applied it. *See Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 121 S.Ct. 1724, 1728, 149 L.Ed.2d 740 (2001) ("To be sure the Court of Appeals here recited these principles, but its application of them is nothing short of baffling."). Moreover, the majority does here exactly what the Supreme Court frowned upon in another recent opinion: it has drawn inferences contrary to the uncontradicted and unimpeached evidence in the record to build "a whole edifice of alleged harassment and retaliation."[1] *See Breeden*, 121 S.Ct. at 1511.

First, let us be clear as to what the jury did not find in its 26–question special verdict. It did not find Toshiba or any of Winarto's individual co-workers or supervisors liable for sexual harassment, harassment based on race or national origin, or sexual discrimination. It did not find either Toshiba or Roger Taylor liable for discrimination based on race or national origin. It did not find that Winarto suffered a disability that limited her ability to participate in major life activities. It did,

1. This language is borrowed from Judge Fernandez's dissent from the unpublished panel decision in *Breeden v. Clark County School District*, 232 F.3d 893 (9th Cir.2000), which was reversed by the United States Supreme Court in *Clark County School District v. Breeden*, 532 U.S. 268, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam).

however, find (i) Toshiba and Taylor liable for discriminating against Winarto based on her back and ankle injuries; (ii) Toshiba and Birtch liable for "inflicting violence or intimidation in the workplace because of [ ] Winarto's race, national, origin or sex," in violation of §§ 51.7, 52(b) and 52.1 of the California Civil Code; (iii) Taylor liable for aiding and abetting in the infliction of that violence; (iv) Toshiba and Taylor liable for retaliatory termination in response to Winarto's complaint to Toshiba's Human Resources department; and (v) malice, oppression, or fraud in their conduct. The jury awarded Winarto $95,000 in compensatory damages but could not agree on a punitive damages award. It is only the jury findings of discrimination based on back and ankle injuries (perceived as a disability), discriminatory workplace violence, and retaliatory termination that the district court set aside as unreasonable under Rule 50.

It is appropriate to review in full the Supreme Court's recent statement as to the standard for granting JMOL under Rule 50. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). JMOL is appropriate "when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Id.* at 149, 120 S.Ct. 2097 (quoting Fed.R.Civ.P. 50(a)). When reviewing the record as a whole, "the court must draw all reasonable inferences in favor of the nonmoving party," keeping in mind that "'[c]redibility determinations, the weighing of the evidence, and the drawing

of legitimate inferences from the facts are jury functions, not those of a judge.'" *Id.* at 150, 120 S.Ct. 2097 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, the Supreme Court explained, when deciding a Rule 50 motion, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the non-movant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* at 151, 120 S.Ct. 2097 (internal quotation and citations omitted).

The district court did exactly that. It relied on all the legitimate inferences that could be drawn in favor of Winarto based on the uncontroverted evidence in the record and still found that, as a matter of law, Winarto had failed to establish a prima facie case of either retaliation or disability discrimination. The majority, on the other hand, disregards the uncontroverted and unimpeached evidence on the record, instead indulging in its own speculation as to what a "reasonable juror" might have thought. Only by freeing itself from the confines of what is supported by the record could the majority find the "evidence" of pretext it sought. Upon this hypothesized house of cards, the majority builds a case for Winarto that even Winarto did not make. As the Supreme Court recently warned us in no uncertain terms, "[t]his will not do." *Breeden*, 121 S.Ct. at 1511.[2] We are not permitted to hypothesize causal links between adverse employment decisions and protected actions or statuses.

---

**2.** In *Clark County School District v. Breeden,* Shirley Breeden claimed that she was transferred in retaliation for filing charges against Clark County School District with the Nevada Equal Rights Commission and the Equal Employment Opportunity Commission ("EEOC"), and for filing her federal lawsuit. *Breeden,* 121 S.Ct. at 1510. The uncontroverted evidence showed that Clark County was not aware of Breeden's lawsuit until after

Because Toshiba's reduction in force constituted a legitimate, non-discriminatory reason for terminating Winarto, *see Sengupta v. Morrison–Knudsen Co., Inc.,* 804 F.2d 1072, 1075 (9th Cir.1986), the burden of persuasion of pretext shifted to Winarto. She had to demonstrate, whether from credible evidence already in the record or through additional evidence, *see Reeves,* 530 U.S. at 143, 120 S.Ct. 2097, that Toshiba terminated her in retaliation for her complaints and due to discrimination based on her disability—and not because it was otherwise engaged in the work force reduction. Pretext can be established in two ways: "(1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Chuang v. Univ. of Cal. Davis,* 225 F.3d 1115, 1127 (9th Cir.2000). Both of these methods have one critical factor in common—they require evidentiary support.

Even though Human Resources employee Trubey took sufficient steps to ensure that the final decision to lay off Winarto was not itself based on retaliatory motives, the majority finds pretext in the factors that contributed to the decision to terminate Winarto. The majority finds the rat-

ings in Taylor's 1994 performance review to be of particular significance. It concludes that the performance evaluations provided a legally sufficient basis for finding pretext because the jury could have found Winarto's lower evaluation resulted from Taylor's exasperation with Winarto's legally protected complaints about her co-workers, and because her declining performance reviews were an important factor in the termination decision.

This is not a reasonable inference, however, when the uncontroverted evidence of the timing of the termination decision and the completion of the performance evaluation are also considered. Taylor completed Winarto's evaluation in December, 1994. There is no evidence in the record that, at that time, Taylor knew Toshiba was going to downsize in 1995, that their department would be asked to reduce its head count by one, or that if he gave Winarto low scores she would be the one terminated. Not only does the majority draw an unreasonable inference here, it is one the jury could not make consistently with its own response to Question Nineteen in the special verdict form. There, the jury found that the protected conduct for which Winarto was allegedly terminated was Winarto's "complaint to Toshiba's Human Resources department." This complaint was not filed until March, 1995, close to four months

---

the decision to transfer was announced. We, however, found a causal connection existed between Breeden's protected activities and the transfer because the EEOC's right-to-sue letter was issued before the transfer was announced and because the transfer occurred one month after Clark County learned of the lawsuit. *Id.* at 1510–11. We therefore reasoned "that the letter provided petitioner with its first notice of respondent's charge before the EEOC, and hence allowed the inference that the transfer proposal made three months later was petitioner's reaction to the charge." *Id.* at 1511. The Supreme Court determined

that the majority went astray when it engaged in this unreasonable inference drawing. *Id.* The Court found no evidence that Clark County knew of the right-to-sue letter, and even if it had known, the temporal proximity—20 months—did not support the inference we drew. Thus, the Court determined that "neither the grounds that respondent presented to the District Court, nor the ground she added on appeal, nor even the ground the Court of Appeals developed on its own, sufficed to establish a dispute substantial enough to withstand the motion for summary judgment." *Id.*

*after* the 1994 evaluation was completed and close to three months *after* Winarto was recommended as a candidate for layoff during Toshiba's downsizing in January, 1995. Thus, the majority's unsupported hypothesis that Taylor gave Winarto low evaluation scores in retaliation for something that had yet to happen is patently unreasonable.

The majority sidesteps the central issue of the case—whether Toshiba terminated Winarto in a retaliatory manner—by focusing exclusively on Taylor's evaluations and not on Trubey's independent "Reduction In Force" (RIF) analysis. The uncontroverted evidence demonstrates that the termination decision was made by individuals who had no knowledge of Winarto's 1995 Human Resources complaint. Roger Taylor proposed Winarto as a likely candidate for layoff, but before any decisions were made, Trubey conducted the RIF analysis. Use of the RIF analysis ensured that Trubey, as a neutral observer, looked at the performance of various employees, what skills they had, whether their skills would be beneficial to the business, their ratings, and their ages to ensure that the best candidate for termination was selected and that there was no discrimination in the decision. Trubey reviewed *all* the members of the MIS department, including the members of Taylor's team. However, as Trubey testified at trial, others in the department had "comparable, if not stronger software skills, and they had more flexibility." Specifically, Winarto was criticized as being "very linear and very focused.... If a call came through to her, she would say 'Well, that's not my product. Please call again.'"

*Breeden* does not allow us to make the inferential leap that the majority makes in connecting Taylor's supposed discriminatory ratings with Toshiba's later decision to terminate Winarto. Taylor's evaluations, although relevant, do not prove discriminatory retaliation sufficient to show pretext in Trubey's decision to terminate Winarto. Trubey's decision was independently based on several other factors besides Winarto's low evaluation scores, such as Winarto's skill and experience. The uncontroverted evidence demonstrates that Winarto was given a full, fair, and independent consideration by Trubey. In fact, Toshiba terminated five other individuals[3] along with Winarto for similar reasons. Uncontroverted trial testimony revealed that Winarto's skills were no longer key because her responsibilities were absorbed by remaining teammates. No one was hired to replace Winarto. Because there was no legally sufficient evidentiary basis for the jury's verdict, the district court did not err in granting JMOL.

As additional support for its finding of pretext, the majority relies on Winarto's belief that Taylor resented her. Winarto's opinion that, after she informed Taylor of her temporary lifting restrictions, he looked at her "rudely, angrily, and with such intensity that she almost 'fell to the ground,'" cannot support this inference. Winarto's perception of Taylor's facial expressions is not evidence of Taylor's discriminatory motive—it is only evidence of her impressions.

Nor do the comments contained in Winarto's 1994 evaluation support the majority's finding of pretext. The majority concludes that Taylor's observations that

---

**3.** As the district court noted, "except for plaintiff, all other employees designated for layoff were Caucasian" men and women.

Winarto "does not assume responsibility and help resolve conflicts" and needs to "improve teamwork with more participation and challenges" support the conclusion that Taylor's explanations were "pretextual as both unworthy of credence *and* likely motivated by unlawful retaliation." There is no evidence in the record to support this inference, and as the Supreme Court held in *Breeden,* the mere fact that a particular inference is possible does not allow us to rely on it in deciding whether to grant JMOL. *Breeden,* 121 S.Ct. at 1511.

Winarto could show pretext by providing evidence that Toshiba did not terminate other employees who were similarly situated. *See, e.g., Shapolia v. Los Alamos Nat'l Lab.,* 992 F.2d 1033, 1039 (10th Cir. 1993) (poor evaluations are not enough to establish pretext unless the plaintiff can show direct evidence of discriminatory retaliation). But she presented no such evidence to the district court. Faced with declining profits, Toshiba was forced to lower its operating costs by reducing its workforce. The entire department of Documentation and Training was eliminated, and a number of other departments, including Winarto's Management Information Systems Department ("MIS"), were asked to reduce their head count by one. Not only did Winarto have the lowest performance evaluations in her department, but, unlike each of her co-workers, Winarto possessed no unique skill that made her irreplaceable. Although Winarto received praise for her efforts in 1994, ramming skills were no longer essential to the MIS department, so it is speculative to assume, as does the majority, that even if Winarto's scores were higher, she would not have been laid off due to her current lack of skills.

Lastly, the majority relies on Winarto's argument that she was discriminatorily de-

nied the opportunity to attend training seminars as further evidence that the evaluation scores were pretextual. The uncontroverted evidence, however, demonstrates that Winarto attended four training seminars. She was not allowed to attend only those seminars for which she was unqualified or that focused on duties unrelated to her own. There was no evidence that the rejection of these seminar requests was a pretext for discrimination.

Because, as the district court concluded, there is no evidence in the record that Winarto was terminated in retaliation for her complaint to the Human Resources Department and, indeed, Winarto's own undisputed testimony establishes that her discrimination and harassment complaint was fully and appropriately investigated, I would affirm the district court's grant of Toshiba's Rule 50 motion as to retaliatory discharge.

I would therefore affirm the district court's judgment on all claims except liability under California Civil Code §§ 51.7, 52(b) and 52.1.