Filed 9/5/24  Suleimanyan v. UTLA CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ASTINE SULEIMANYAN, | B326607 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 20STCV10892) |
| v. | |
| UTLA et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard J. Burdge, Jr., Judge.  Affirmed.

Greene Broillet & Wheeler, Tobin M. Lanzetta, Aaron L. Osten; Esner, Chang, Boyer & Murphy and Stuart B. Esner for Plaintiff and Appellant.

Cohen Williams, Kathleen M. Erskine and Roya S. Ladan for Defendants and Respondents.

\* \* \* \* \* \*

Astine Suleimanyan (plaintiff) sued her former employer and two of its staffers for various employment-related claims as well as claims under the Tom Bane Civil Rights Act (Bane Act) (Civ. Code, § 52.1) and the Ralph Civil Rights Act (Ralph Act) (*id.*, § 51.7).  The trial court entered summary adjudication for the employer and summary judgment for the staffers on plaintiff's sexual harassment claim due to her failure to timely exhaust her administrative remedies and on plaintiff's Bane Act and Ralph Act claims due to the absence of any evidence of physical violence or a threat of such violence.  Because we independently conclude that these rulings were correct, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I.      Facts[1]

####      A.      *Plaintiff's employment*

Plaintiff was hired by United Teachers Los Angeles (UTLA) in September 2015 to work as a political organizer.  She resigned

---

1      Consistent with the pertinent standard of review, we resolve all conflicts in the evidence in favor of plaintiff (as the party opposing summary adjudication and judgment) except in the many instances in which plaintiff's declaration in support of her opposition conflicts with her prior deposition testimony, with her discovery responses, or with other statements in her declaration (because a party is not allowed to manufacture disputes of fact by contradicting herself).  (*Scalf v. D. B. Log Homes, Inc.* (2005) 128 Cal.App.4th 1510, 1521-1522; *Whitmire v.*

2

from her position in November 2019, although she took several leaves of absence (from October 2017 to January 2018, from April 2018 to January 2019, and from August 2019 to November 2019).

UTLA also employed field director Brian McNamara (McNamara) and representation coordinator Carl Joseph (Joseph). Although plaintiff worked with those individuals, neither of them served as her supervisor.

## B.     *McNamara's conduct*

Plaintiff and McNamara did not get along, and they had several tense interactions between the time she was hired and October 12, 2017. Those include:

– When plaintiff did not arrive on time for a phone bank event she was responsible for leading in the fall of 2015, McNamara called her on the phone, and "yelled" and "cursed" at her. When plaintiff eventually arrived, McNamara continued their discussion in the hallway outside the event by "yelling" "in [plaintiff's] face" about how her tardiness was "unacceptable." Plaintiff felt "trapped" in the corner of the hallway with McNamara, who was "a tall guy." When event volunteers exited the elevator into the hallway, McNamara ended the interaction and plaintiff went into the event.

– When plaintiff at an April 2017 staff meeting raised concerns that her assignments were too much to handle, McNamara responded by "rais[ing] his voice" and commenting, "How is this too much?" Plaintiff reported that this made her feel "ambushed."

– When plaintiff at a spring 2017 staff meeting said she could not attend a meeting on the date proposed, McNamara

_____

*Ingersoll-Rand Co.* (2010) 184 Cal.App.4th 1078, 1087; *Davis v. Foster Wheeler Energy Corp.* (2012) 205 Cal.App.4th 731, 736.)

3

"raised his voice" when asking why plaintiff could not attend. Plaintiff responded that she would be on vacation.  Plaintiff later reported that McNamara had required her to disclose her "private information" "public[ly]" (namely, that she would be on vacation), and that this constituted a "tactic[]" of "public humiliation" that was "abusive" and motivated to "sabotag[e]" plaintiff and "tarnish[ her] reputation."

– When plaintiff asked McNamara in May 2017 if she could call into a staff meeting (rather than attend in person), McNamara responded with the word "Yep" instead of the word "Yes."

– When plaintiff got up to leave a meeting early, McNamara "pulled a chair in front [of her]" and asked, "Where the fuck are you going?"  Plaintiff went back to her seat, but walked out of the meeting a few minutes later; when she did, McNamara gave her "a very, very nasty look."

– When plaintiff and McNamara attended a work-related retreat in July 2017, McNamara asked plaintiff and another UTLA employee whether they had completed the assigned reading.  After plaintiff confirmed that she had and McNamara commented, "Well, that was fast," plaintiff responded, "Would you prefer I read out loud?" and "It's always something with you, [McNamara]."  McNamara then "stepped forward," "got really close" to her face, and "aggressive[ly]" asked, "What did you say?"  Plaintiff reported this interaction—as well as her feeling that McNamara was displaying "obsessive attention" toward her at the retreat because he on two occasions "immediately followed" her out of the meeting rooms into the hallway—as amounting to "stalking" and "harassing" that made

4

her "feel unsafe" and afraid that McNamara would "physically harm" her.

– When plaintiff and McNamara attended a work retreat at the Westin Bonaventure Hotel in July 2016, McNamara rode the hotel's iconic exterior glass elevator. Plaintiff reported that, from the elevator, McNamara could see into her hotel room (because plaintiff had not drawn the blinds) and characterized McNamara's use of the public elevator as "peeping."

McNamara never touched plaintiff and never engaged in any sexually inappropriate conduct toward her.

McNamara's last act toward plaintiff was on October 12, 2017.

## C.   *Joseph's conduct*

Joseph repeatedly made vulgar and sexually charged comments and gestures toward plaintiff between July 2016 and October 2017.  Those include:

– In 2016 and 2017, Joseph on three or four occasions told plaintiff that there were things he "wanted to do to her."

– In 2016 and 2017, when plaintiff would arrive at office meetings and scan the room for a vacant seat, Joseph on three or four occasions invited her to "sit on Big Papa's lap."[2] These comments made plaintiff feel "devalued" and "humiliated."

– Sometime in 2016 or 2017, plaintiff spit out her chewing gum at a meeting and Joseph asked for the gum so he could "taste" her.

_____

[2]   This was Joseph's self-ascribed nickname; plaintiff requested that Joseph give her a nickname and he anointed her "High Maintenance."  Plaintiff denied having "any type of feeling about" that moniker.

– In July 2017, Joseph told plaintiff he wanted to perform a sexual act and then crudely gestured that act during a dinner at a work retreat.

Plaintiff would confront Joseph about his comments and gestures: She told him that his comment about wanting to "do her" and his crude gesture made her feel uncomfortable. In response, Joseph would "laugh . . . off" his conduct and claim he was "just joking."

Joseph did not physically touch plaintiff, restrict her movement, or aside from the one gesture, do "anything physically toward [her] that made [her] feel intimidated."

Joseph did not make any comments or gestures after October 2017, although plaintiff claims that he "looked [her] up and down" when they passed on a stairwell in January or February 2018.

## II. Procedural Background

### A. *The pleadings*

On March 17, 2020, plaintiff sued UTLA, McNamara, and Joseph (collectively, defendants). In the operative second amended complaint, plaintiff alleged various employment and tort claims: Against all defendants, she alleged claims for (1) sexual harassment under the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.); (2) violation of the Bane Act; and (3) violation of the Ralph Act; against UTLA alone, she alleged claims for (1) gender discrimination under FEHA; (2) retaliation under FEHA and the Labor Code; (3) failure to prevent discrimination, harassment, and retaliation under FEHA; and (4) constructive discharge in violation of public policy.

6

**B.** *Motion for summary adjudication/judgment*

Defendants moved for summary adjudication and/or judgment as to the sexual harassment, Bane Act, and Ralph Act claims asserted against them. They argued that (1) plaintiff's sexual harassment claim was barred because she failed to timely exhaust her administrative remedies as required under FEHA, and (2) plaintiff's Bane Act and Ralph Act claims failed as a matter of law because there was no evidence that she faced a threat of physical violence.[3]

After a full round of briefing and a hearing, the trial court issued a 20-page ruling on November 3, 2021 granting defendants' motion. The court ruled that plaintiff's sexual harassment claim was barred for failure to exhaust her administrative remedies, finding there was "no evidence" to support "equitable tolling" of the statutory deadlines. The court ruled that, although there were triable issues of fact regarding whether plaintiff "truly felt intimidated," defendants were entitled to judgment on her Bane Act and Ralph Act claims because she adduced no evidence of any "violence or threats of violence" against her.

**C.** *Trial*

Plaintiff proceeded to trial on her remaining claims against UTLA in the fall of 2022. She voluntarily dismissed the claims for gender discrimination under FEHA and retaliation under the Labor Code, and the jury rendered a verdict for UTLA on the remaining claims for retaliation under FEHA, failure to prevent retaliation, and constructive discharge.

---

[3] Defendants also argued that the Bane Act claim was time-barred, but the trial court did not rule on that issue and we likewise need not reach it here.

**D.** *Appeal*

Following the entry of judgment for defendants, plaintiff timely filed this appeal.

## DISCUSSION

Plaintiff argues that the trial court erred in summarily adjudicating (1) her FEHA sexual harassment claim due to the failure to exhaust administrative remedies; and (2) her Bane Act and Ralph Act claims due to the absence of any evidence of violence, threats of violence, or intimidation.

A trial court may grant summary adjudication or judgment to a defendant on a "cause of action" if "there is no triable issue of material fact" and the defendant "is entitled to a judgment as a matter of law" on that cause of action. (Code Civ. Proc., § 437c, subds. (c), (f)(1) & (o)(1); *Jimenez v. Superior Court* (2002) 29 Cal.4th 473, 480; *QDOS, Inc. v. Signature Financial, LLC* (2017) 17 Cal.App.5th 990, 998; *State of California v. Continental Ins. Co.* (2017) 15 Cal.App.5th 1017, 1031 [summary adjudication is "'procedurally identical to [a] motion[] for summary judgment'"].) The moving party (usually, the defendant) bears the initial burden of showing that the plaintiff cannot establish "[o]ne or more of the elements of [her] cause[s] of action" or by showing a valid affirmative defense. (Code Civ. Proc., § 437c, subds. (o)(1) & (p)(2).) Once that initial burden is met, the plaintiff bears the burden of "show[ing] that a triable issue of one or more material facts exists as to the cause of action or [an affirmative] defense." (*Id.*, subd. (p)(2).) Summary adjudication or judgment should be denied only when there are "genuine" or "triable" issues of fact to be resolved at trial—that is, when "the evidence would allow a reasonable trier of fact to find . . . in favor of the party opposing the motion." (*Serri v. Santa Clara University* (2014) 226

8

Cal.App.4th 830, 860; *Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1176, fn. 2 [applying these standards to motions for summary adjudication].)

We independently review a grant of summary adjudication or summary judgment. (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347.) We also independently review whether the doctrine of exhaustion of administrative remedies bars a claim. (*Alexander v. Community Hospital of Long Beach* (2020) 46 Cal.App.5th 238, 251.)

## I.    Plaintiff's FEHA Sexual Harassment Claim

### A.    *Pertinent law*

1.    *FEHA and its administrative exhaustion requirement, generally*

FEHA is meant to "safeguard the rights of all persons to seek, obtain, and hold employment without discrimination" or harassment. (*Salas v. Sierra Chemical Co.* (2014) 59 Cal.4th 407, 420.) FEHA contemplates a two-step process—namely, (1) the Department of Fair Employment and Housing (the Department) enforces FEHA administratively by "'receiv[ing], investigat[ing] and conciliat[ing] complaints of unlawful employment discrimination'" and harassment; and (2) if and only if this administrative process is exhausted, individual employees may then sue their employers in court. (*Kim v. Konad USA Distribution, Inc.* (2014) 226 Cal.App.4th 1336, 1345 (*Kim*); *Pollock v. Tri-Modal Distribution Services, Inc.* (2021) 11 Cal.5th 918, 931 (*Pollock*); *Rojo v. Kliger* (1990) 52 Cal.3d 65, 83 ["exhaustion of FEHA administrative remedies is a prerequisite to judicial relief on a statutory cause of action"].)

To exhaust FEHA's administrative remedies, an employee must first file a "verified complaint" with the Department within

"one year from the date upon which the alleged unlawful practice" occurred.  (Former Gov. Code, § 12960, subds. (b) & (d); Cal. Code Regs., tit. 2, § 10009, subd. (e); *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 492.)  Even after this administrative complaint is filed with the Department, the employee may sue her employer in court only after the Department issues a "right-to-sue notice," which happens (1) when the employee elects to "forgo having the [D]epartment investigate [her] complaint" by requesting an "immediate right-to-sue notice" (Cal. Code Regs., tit. 2, §§ 10005, 10004, subd. (c); *Clark v. Superior Court* (2021) 62 Cal.App.5th 289, 305); or (2) when no immediate right-to-sue notice is sought, when the Department has investigated the verified complaint for 150 days (as well as pursuing any attempts at "conciliation and/or settlement") without filing its own civil complaint against the employer or has, prior to the 150-day window, determined it will not pursue legal action (Gov. Code, § 12965, subd. (b); Cal. Code Regs., tit. 2, §§ 10005, subd. (e), 10024, subd. (a), 10025, subd. (a), 10026, subd. (a), 10004, subd. (a), 10031, subd. (a); *Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1726 (*Martin*); *Yurick v. Superior Court* (1989) 209 Cal.App.3d 1116, 1120-1121.)  An employee has one year to file suit after receiving the right-to-sue notice.  (*Acuna v. San Diego Gas & Electric Co.* (2013) 217 Cal.App.4th 1402, 1413 (*Acuna*).)

If the employee does not submit a "right-to-sue complaint" with the Department seeking to bypass any investigative process and obtain an "immediate right-to-sue notice" (Cal. Code Regs., tit. 2, § 10005), then the process of filing a verified complaint has many steps.  The process starts with the employee filing a "Pre-Complaint Inquiry" designed to have the Department gather

10

factual information about the alleged FEHA violation. (Cal. Code Regs., tit. 2, § 10002, subd. (a).) Consistent with well-settled, pre-2020 law that this initial inquiry filing is *not* a verified complaint (*Cole v. Antelope Valley Union High School Dist.* (1996) 47 Cal.App.4th 1505, 1515; *Holland v. Union Pacific Railroad Co.* (2007) 154 Cal.App.4th 940, 946, fn. 8 (*Holland*)),[4] the standardized form used for the Department's pre-complaint inquiry is captioned "Pre-Complaint Inquiry" and explicitly indicates that it "is not a filed complaint." Once the inquiry form is filed, the Department then "initiate[s] the investigative process" by "conducting an intake interview" with the employee. (Cal. Code Regs., tit. 2, §§ 10002, subd. (b), 10007, subd. (a).) Using the information it acquires in that process, the Department then "draft[s] the language" of the administrative complaint. (*Id.*, § 10009, subd. (a).) Because the complaint must be verified by the employee (*id.*, § 10009, subd. (c)), the employee "may propose modifications" to the Department's draft complaint, but the Department is not obligated to accept those proposed edits (*id.*, § 10009, subd. (f)). The final step is for the employee to sign and verify the complaint, and the date of the employee's signature is the date on which the verified complaint is deemed filed with the Department. (*Id.*, § 10009, subds. (c) & (d).)

An employee's failure to file a timely verified complaint with the Department—that is, within one year of the "alleged

---

4    Our Legislature changed the law effective January 1, 2020 to provide that "filing a complaint means filing an intake form" (Gov. Code, § 12960, subd. (b)), but the Legislature clarified in a new subdivision effective January 1, 2022 that this provision does not apply retroactively to revive claims—like plaintiff's—that became untimely prior to the new law (*id.*, subd. (f)(3)).

11

unlawful practice"—constitutes a failure to exhaust FEHA's administrative remedies (*Holland*, *supra*, 154 Cal.App.4th at p. 945; *Kim*, *supra*, 226 Cal.App.4th at p. 1345 ["[e]xhaustion includes the timely filing of administrative complaints"]; *Pollock*, *supra*, 11 Cal.5th at p. 931 ["'The timely filing of an administrative complaint' before the [Department] 'is a prerequisite to the bringing of a civil action for damages'"]; *Valdez v. City of Los Angeles* (1991) 231 Cal.App.3d 1043, 1052 (*Valdez*)), and is a basis for dismissing a FEHA claim on summary judgment (*Martin*, *supra*, 29 Cal.App.4th at p. 1724). It is the employee-plaintiff who bears the burden of proving that she exhausted her administrative remedies.  (*Kim*, at p. 1345.)

2.	*Equitable tolling*

Because an employee's failure to exhaust administrative remedies does not divest a trial court of subject matter jurisdiction (*Holland*, *supra*, 154 Cal.App.4th at p. 946; *McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 107), courts retain an equitable power to excuse the untimely filing of a complaint with the Department (*Accardi v. Superior Court* (1993) 17 Cal.App.4th 341, 349).  As pertinent here,[5] courts may deem the one-year deadline to file an administrative complaint equitably "tolled" in situations where the Department (1) "misleads the [employee] about filing

---

[5]	Courts also retain the equitable power to reach back and excuse unexhausted claims that are part of a "continuing violation" (*Acuna*, *supra*, 217 Cal.App.4th at p. 1412; *Valdez*, *supra*, 231 Cal.App.3d at p. 1052), but that doctrine is not implicated here.

obligations," or (2) "commits errors in processing the [employee's] complaint." (Cal. Code Regs., tit. 2, § 10018.)**6**

Because the power to equitably toll is, by its very nature, grounded in "equity" (*Denney v. Universal City Studios, Inc.* (1992) 10 Cal.App.4th 1226, 1234 (*Denney*)) and requires a "balancing [of] the equities" (*Rodriguez v. Airborne Express* (9th Cir. 2001) 265 F.3d 890, 901-902), the doctrine of equitable tolling is more likely to be invoked when "[t]he equities favor" the employee, such as when she (1) "diligently pursued [her] claim," (2) "was misinformed or misled by the [Department]," (3) "relied in fact on the misinformation or misrepresentations of that agency, causing [her] to fail to exhaust [her] administrative remedies," and (4) "was acting pro se at the time." (*Rodriguez*, at p. 902.) Critically, an employee's diligence and lack of negligence while exhausting her administrative remedies is not merely a pertinent factor to equitable tolling—it is an absolute prerequisite. (*Id.* at p. 902, fn. 12 ["Diligence is required for the successful invocation of virtually any equitable doctrine"]; *Scholar v. Pacific Bell* (9th Cir. 1992) 963 F.2d 264, 268 ["claimant's failure 'to exercise due diligence'" is fatal]; *Watson v. Chubb & Sons, Inc.* (9th Cir. 2002) 32 Fed. Appx. 827, 828-829; *Lehman v. United States* (9th Cir. 1998) 154 F.3d 1010, 1016 [equitable tolling is "not available to avoid the consequences of

_____

**6**     Equitable tolling is also appropriate when the Department "improperly discourages or prevents the [employee] from filing at all" (Cal. Code Regs., tit. 2, § 10018), but that basis is not implicated here. Although plaintiff argues that there may be *other* grounds for equitable tolling, her argument points to the various circumstances bearing on the propriety of tolling due to misleading conduct or errors in processing, rather than setting forth an additional, independent basis for tolling.

13

one's own negligence"]; cf. *Holland*, *supra*, 154 Cal.App.4th at p. 947 ["diligen[ce] in pursuit of [administrative] remedy" counsels in favor of equitable tolling].)

Because equitable tolling is a defense to the failure to exhaust, once an administrative complaint is shown to be untimely (and hence unexhausted), the burden shifts to the employee to prove the propriety of equitable tolling. (*Holland*, *supra*, 154 Cal.App.4th at p. 945.)

### B. *Facts pertinent to administrative exhaustion*[7]

#### 1. *Pre-complaint inquiry form*

On October 16, 2017, plaintiff filled out and filed the Department's "Pre-Complaint Inquiry" form. Plaintiff's hand-written responses on the form state that the conduct at issue occurred from April 17, 2017 to October 13, 2017. Her narrative response on the form discussed only McNamara's conduct; plaintiff did not mention Joseph and, unlike McNamara and UTLA, she did not list Joseph as a "respondent."

---

[7] To sidestep plaintiff's assertions that the trial court wrongly excluded portions of her declaration and wrongly resolved factual disputes between her declaration and the employment agency's business records, we will consider the excluded portions of her declaration and, as noted above, resolve all factual disputes, including those between plaintiff's declaration and the records, in plaintiff's favor except those created by inconsistencies in plaintiff's declaration or by contradictions between that declaration and plaintiff's prior discovery responses.

14

2. *Pre-complaint investigation by the Department*

a. Initial interview in November 2017

On November 4, 2017, the Department sent plaintiff an acknowledgement that her "inquiry ha[d] been received," and assigned a Department analyst to her case five days later.

On November 13, 2017, the analyst emailed plaintiff asking to schedule an interview "to obtain more information about [her] complaint." They agreed to conduct the interview the next week. The analyst confirmed the interview in a letter to plaintiff summarizing that she had "filed a Pre-Complaint Inquiry" with the Department, and the Department would "determine if [her] complaint warrants further investigation" or "prosecution."

The interview occurred on November 20, 2017.

b. Requests for further information in 2018

The Department analyst next reached out to plaintiff on March 14, 2018 to ask her for a copy of her UTLA paystub. Plaintiff responded that she did not remember the analyst, and asked him to "hold off" until they had another conversation because she does not "know what this [is] for."

On June 11, 2018, the Department analyst reached out to plaintiff again, this time to ask her to "explain" what "professional growth opportunities" she was denied (which was an adverse action she listed on her inquiry form). Although we accept as true plaintiff's statement in her declaration that she "described in detail all specifics that [the analyst] requested," she provides no date for her response beyond asserting she was "always prompt in responding." It is undisputed, however, that on September 4, 2018, the Department analyst called and emailed plaintiff stating that he did *not* have the information he had requested in June 2018 and needed it so it could "be included

15

in the complaint." Plaintiff did not respond to the analyst's early September entreaties.

### 3. *Initial draft complaint*

On September 7, 2018, the Department analyst sent plaintiff a draft complaint. The draft complaint alleged that (1) plaintiff experienced sexual harassment by McNamara between July 2016 and October 2017, and (2) plaintiff was denied equal pay on the basis of her gender.

Accompanying the draft complaint was a cover letter. That letter asked plaintiff to "sign and return" the complaint if she "agree[s] with the language," but if not, to contact the analyst to discuss any "concerns." The cover letter also explicitly advised plaintiff that (1) "[t]he law requires that a complaint be filed within one (1) year from the date of the discriminatory act," so plaintiff should sign it or discuss any concerns with the language "as soon as possible," and (2) plaintiff's failure to respond within 10 days would result in the Department closing her case.

On September 9, 2018, plaintiff contacted the analyst and told him that the draft complaint was "inaccurate." On a September 10, 2018 call, plaintiff elaborated that she was confused over whether she was sexually harassed by McNamara or was discriminated against on the basis of gender. Plaintiff did not at that time provide any edits, and instead promised the analyst she would email him proposed language.

When plaintiff did not send the analyst her proposed edits, he left her voicemails on September 21, 2018 and September 28, 2018 and sent her an email on September 28, 2018: Each communication requested "the edited complaint language" so the complaint could be finalized for her signature; the analyst cut

16

and pasted the draft complaint's allegations into the email as a reminder.

        4.     *October 2018 edits*

Although no edits from plaintiff appear in the Department's file and plaintiff did not during discovery produce any email from her containing those edits (because she inconsistently blamed her email provider for intentionally deleting them and herself for accidentally deleting them), we accept as true plaintiff's declaration that she emailed her proposed (but unspecified) edits at some unspecified time in October 2018.

        5.     *January 2019 edits including Joseph*

On January 8, 2019, plaintiff emailed the Department analyst to complain that she had sent her proposed edits to him "a few months ago" and had not heard back.[8] When the analyst told plaintiff on a January 10, 2019 call that he never received her edits, plaintiff asked for the draft complaint language once again. The analyst emailed plaintiff that language later that day.

Two weeks later, on January 23, 2019, plaintiff provided edits and for the first time included allegations regarding Joseph. Plaintiff also for the first time requested an immediate right-to-sue letter from the Department.

        6.     *Revised draft complaint*

After plaintiff made two more requests for status updates in February 2019, the Department analyst sent plaintiff a revised

---

[8]     Because plaintiff provides no greater specificity, we cannot construe this as indicating that the proposed edits were sent any earlier than the uncertain October 2018 timeframe she provided elsewhere.

17

draft complaint for signature on March 1, 2019. The revised draft complaint alleged that (1) plaintiff experienced sexual harassment by McNamara and Joseph between July 2016 and October 2017, (2) plaintiff was denied equal pay on the basis of her gender, and (3) a reprimand plaintiff received in April 2018 was retaliation for her complaints of harassment. The cover letter accompanying the revised draft complaint contained the same provisos as the cover letter sent in September 2018.

Plaintiff refused to sign the revised draft complaint because, "according [to] the research [she had] done," the complaint should bear the date she filed her inquiry form—not the date of the draft.

The Department analyst referred plaintiff to a supervisor, and plaintiff—now represented by counsel—worked with the supervisor to finalize the complaint. Plaintiff forwarded the supervisor all of her email correspondence with the analyst; there were no emailed edits from October 2018.

### 7. *Verified complaint and right-to-sue notice*

Plaintiff signed and verified the revised draft complaint on April 19, 2019 and, in accordance with the law, the verified complaint was dated as of that date (rather than the date plaintiff filed the inquiry form).

The Department issued plaintiff a right-to-sue notice on February 21, 2020.

### C. *Analysis*

Because UTLA's liability for sexual harassment turns on the conduct of McNamara and Joseph, and because the last alleged unlawful act committed by McNamara and Joseph differs, we analyze the timeliness of plaintiff's exhaustion of administrative remedies as to McNamara and Joseph separately.

18

1. *Claim based on McNamara's conduct*

Plaintiff's allegation in her verified complaint with the Department that McNamara's alleged harassment ended on October 12, 2017 is conclusive, and obligated her to file her administrative complaint by October 12, 2018.[9]  Because it was not filed until April 19, 2019, plaintiff did not timely exhaust her administrative remedies.  The burden thus shifted to plaintiff to establish triable issues of material fact as to the applicability of equitable tolling.[10]  Plaintiff resists that the burden shifted to her, arguing that it remained on the Department to show that any delay was her fault, but plaintiff's argument misapplies the above-cited precedent:  Although defendants as the moving parties had the initial burden of showing their entitlement to relief on summary adjudication or judgment, defendants met this burden when they showed plaintiff's verified complaint was

---

[9]    Although plaintiff hand-wrote on the inquiry form that the "last date of harm" was October 13, 2017, her verified complaint with the Department states that the conduct occurred "on or before" October 12, 2017; we need not tarry over this one-day discrepancy because plaintiff failed to timely exhaust her administrative remedies based on either date.

[10]    We note that, contrary to plaintiff's assertion, equitable tolling is an issue for the court, not the jury. (*Hopkins v. Kedzierski* (2014) 225 Cal.App.4th 736, 745-746; *Doe v. Marten* (2020) 49 Cal.App.5th 1022, 1029; cf. *Brome v. Dept. of the California Highway Patrol* (2020) 44 Cal.App.5th 786, 790-791 [discussing how "reasonable jury" could find disputed issues as to equitable tolling, but not confronting issue of which trier of fact must address issue on the merits]; see generally *People v. Knoller* (2007) 41 Cal.4th 139, 155 [""An opinion is not authority for propositions not considered""].)

untimely and hence not exhausted; that showing *itself* shifted the burden to plaintiff to show equitable tolling applies, which dovetails neatly with the general rule that the burden of showing administrative exhaustion rests with the plaintiff (accord, *Holland*, *supra*, 154 Cal.App.4th at p. 945).

### a. Misleading conduct

An employee may be entitled to equitable tolling of the one-year deadline for filing a verified complaint with the Department if the Department "misle[d]" the employee about her "filing obligations." (Cal. Code Regs., tit. 2., § 10018.) To trigger equitable tolling, the Department must make an affirmative statement or action, such as giving the employee "inaccurate advice" or "assurances" that procedural noncompliance will be overlooked. (*Holland*, *supra*, 154 Cal.App.4th at pp. 946-947 [Department inaccurately "assured" employee that he "need not be concerned" about upcoming administrative deadlines]; *Denney*, *supra*, 10 Cal.App.4th at p. 1234 [agency inaccurately told employee that administrative complaint alleging one claim was "sufficient" to exhaust as to different claims]; *Albano v. Schering-Plough Corp.* (9th Cir. 1990) 912 F.2d 384, 386-387 [same].)

The trial court here correctly ruled that the undisputed facts show plaintiff's untimely verified complaint is not excused by any misleading conduct by the Department. At no point did the Department incorrectly advise or assure plaintiff that she could ignore pending deadlines; to the contrary, the Department analyst when transmitting the draft complaint on September 7, 2018 explicitly advised plaintiff of the pending one-year deadline and the need for alacrity.

Plaintiff responds with what boils down to three arguments.

First, plaintiff argues that the Department analyst in some correspondence referred to plaintiff's "Pre-Complaint Inquiry" form as a "complaint," such that plaintiff was misled into believing that she had *already* filed her verified complaint once she filed her Pre-Complaint Inquiry. We reject this argument. The inquiry form *itself* said that it was not a complaint. (And contrary to what plaintiff suggests, our Legislature's decision to amend the law to make the filing of an inquiry form synonymous with the filing of a verified complaint—and to *not* make that change retroactive—indicates that, prior to this amendment, the inquiry form and the verified complaint were *not* synonymous.) The analyst reminded plaintiff in September 2018 that the complaint was due "within one (1) year from the date of the discriminatory act," and plaintiff knew—because she wrote it on the inquiry form—that McNamara's acts ended on October 13, 2017. What is more, the whole purpose of the months-long back-and-forth between plaintiff and the analyst was to prepare and file the verified complaint, which would have made no sense if—as plaintiff now asserts—she had already filed a qualifying complaint. Taking all of this together, the analyst's occasional use of informal shorthand in calling the "Pre-Complaint Inquiry" form the "complaint" could not have misled plaintiff as a matter of law. We decline to adopt a rule that rests on the notion that employees are effectively potted plants who cannot read, do math, or understand the context in which statements are made.

Second, plaintiff argues that even if the Department did not affirmatively mislead her, she was "[]reasonabl[y]" confused and the Department therefore misled her by not clarifying and correcting her unstated confusion. This argument relies on the wrong legal standard.

21

Third and lastly, plaintiff argues that she is not a lawyer. This is true, but it does not alter the fact that the Department did nothing to mislead her.

      b.  Errors in processing the complaint

An employee may be entitled to equitable tolling of the one-year deadline for filing a verified complaint with the Department if the Department "commits errors in processing [her] complaint." (Cal. Code Regs., tit. 2, § 10018.)

The trial court here correctly ruled that plaintiff's untimely verified complaint is not excused by any Department errors in processing her complaint because, contrary to what she asserts on appeal, the undisputed facts show she was, as matter of law, not diligent in prosecuting her complaint. Although she filed her inquiry form soon after McNamara's conduct ended and she responded quickly to the Department analyst's request for an interview in November 2017, plaintiff thereafter (1) told the analyst in March 2018 to "hold off" on processing her complaint; (2) did not contemporaneously dispute the analyst's report that he never received the information he requested from plaintiff in June 2018; and (3) waited between three and seven weeks to provide proposed edits to the analyst in response to the initial draft complaint sent in September 2018, despite being warned that the deadline was looming (and, at that time, was just five weeks away). Even if we indulge in speculation that plaintiff sent edits to the analyst at the *beginning* of the vague "October 2018" timeframe plaintiff provided in opposition to the summary adjudication motion, that would have still left the Department less than two weeks to consider whether to accept or reject her edits, redraft the complaint, and recirculate it for her consideration. Plaintiff accuses the Department of "slow

22

walking" the processing of her complaint, but the undisputed facts show *she* was the slow walker.

Plaintiff responds with what boils down to four arguments.

First, plaintiff argues that the Department committed errors in processing her complaint because the analyst did not produce a draft complaint until early September 2018, five weeks before the one-year deadline was to expire. For support, she argues that the Department's regulations require analysts to assign "priority" when a statute of limitations is about to expire, and to accept any "written statement or correspondence" as the employee's administrative complaint when "necessary to avoid missing the statute of limitations for filing [a verified compliant] with the [D]epartment." (Cal. Code Regs., tit. 2, §§ 10008, subds. (a) & (b), 10010, subds. (a) & (c).) This argument does not negate our conclusion that plaintiff was not diligent as a matter of law. Moreover, this argument ignores that the *reason* it took the analyst nearly 11 months to produce a draft complaint is because *plaintiff* told him to "hold off" at the four-month mark and because the analyst did not receive information plaintiff said she transmitted in June 2018. The regulations plaintiff cites do not compel a contrary conclusion: The duty to give priority grants a "priority for the purpose of scheduling an intake interview" when the statute of limitations is about to run (*id.*, § 10008, subd. (a)) (but here, the intake interview was conducted almost immediately after plaintiff filed her inquiry form and long before the statute of limitations was about to expire), and the Department's ability to accept other filings in lieu of a verified complaint applies "[i]f the statute of limitations would expire before an intake interview could be scheduled and completed for a complaint filed for investigation" (*id.*, § 10010, subd. (a)) (but

23

again, the intake interview in this case was conducted long before the limitations period would expire).

Second, plaintiff argues that the Department had a duty to file the unverified first draft of her complaint by the October 12, 2018 deadline because one of the Department's regulations obligates the Department to "file the unverified complaint and accept it as received" where the employee "cannot verify a complaint for investigation before the applicable statute of limitations runs." (Cal. Code Regs., tit. 2, § 10009, subd. (d).) As a threshold matter, it is not clear the Department's duty under this regulation is triggered here because the analyst got the initial draft complaint to plaintiff five weeks prior to the statute of limitations deadline, which may not qualify as a situation where the employee "*cannot* verify a complaint" before the deadline. More to the point, plaintiff called the analyst days after receiving the draft complaint, told him it was "inaccurate" and that she would be sending edits. In effect, she told him to hold off and then did nothing for weeks. The regulation does not compel the Department to file a knowingly inaccurate complaint when the employee has promised to provide edits that would correct those inaccuracies. And nothing in the regulation obligates a court considering equitable tolling to ignore the employee's lack of diligence and her role in creating the circumstances that may implicate the regulation in the first place.

Third, plaintiff argues that the Department's first draft complaint was riddled with errors, and that the analyst's alleged careless drafting constitutes errors in the processing of her complaint. This argument overlooks that the allegations involving McNamara were largely the same in this initial draft complaint and the final complaint plaintiff verified and signed;

24

the analyst's initial draft complaint as to McNamara was thus not riddled with errors.  What plaintiff characterizes as "error" is the initial draft complaint's omission of any facts regarding Joseph, but, as noted below, plaintiff presents no evidence that she asked the Department to include allegations regarding Joseph until January 2019, long after the limitations period ran as to McNamara in October 2018.

Fourth and finally, plaintiff argues that any result that does not favor her amounts to a "'procedural gotcha'" because the Department "lulled" her "into believing that she had done what was necessary to preserve her rights"—leaving her shocked and surprised when the trial court concluded her verified complaint was untimely.  Because, as we have concluded, the undisputed facts show that the Department did nothing to mislead plaintiff, this argument lacks any factual foundation in the record and amounts to a request that an employee's misapprehension of deadlines—no matter how formed—entitles her to ignore those deadlines.  That is not the law, and would obliterate most deadlines if it were.

2.    *Claim based on Joseph's conduct*

Plaintiff's allegation in her verified complaint that Joseph's alleged harassment ended in October 12, 2017 is conclusive, and thus obligated her to file a verified complaint with the Department by October 12, 2018.  The first time plaintiff asserted that Joseph's conduct continued into January or February 2018 was during her deposition.[11]  Because her verified complaint was

---

11    Plaintiff did not identify the early 2018 incident when Joseph looked her "up and down" as she walked down a staircase in (1) her complaint to UTLA's human resources department filed shortly after the incident, (2) her inquiry form or any iteration of

25

not filed until April 19, 2019, plaintiff did not timely exhaust her administrative remedies under either timeline. The burden thus shifted to plaintiff to establish triable issues of fact as to the applicability of equitable tolling.

Because, as noted above, the undisputed facts show no misleading conduct by the Department, the sole remaining basis for equitable tolling is any errors in the processing of plaintiff's complaint. However, plaintiff's lack of diligence is even more pronounced as to Joseph because the first time that plaintiff even *mentioned* him to the Department was in January 2019, despite Joseph's conduct occurring at a minimum one year prior. Although plaintiff's declaration indicates that she provided the Department "edits" to correct "inaccuracies" in the initial draft complaint in October 2018, this language says nothing about *adding* new allegations regarding an entirely different person; we decline to speculate that plaintiff's choice of words meant something beyond what she said, and plaintiff has offered no other evidence as to the content of her October 2018 missive to the analyst. Even if we assume that Joseph's final act of "looking [her] up and down" while passing her on a staircase occurred in February 2018, that means plaintiff waited 11 months to raise the issue. She was not diligent, and that lack of diligence dictates that equitable tolling not apply as a matter of law.

## II. Plaintiff's Bane Act and Ralph Act Claims

To prevail on a Bane Act claim, a plaintiff must establish that (1) the defendant has "interfere[d]" with the "exercise or enjoyment" of her constitutional rights, (2) "by threat, intimidation, or coercion," and (3) with the "specific intent to

---

her administrative complaint filed with the Department, or (3) her operative complaint filed in the trial court.

26

violate" her civil rights.  (Civ. Code, § 52.1; *Schmid v. City & County of San Francisco* (2021) 60 Cal.App.5th 470, 483; *Shoyoye v. County of Los Angeles* (2012) 203 Cal.App.4th 947, 956-957 (*Shoyoye*).)  To prevail on a Ralph Act claim, a plaintiff must establish that (1) the defendant made a "discriminatory" distinction on the basis of a protected characteristic the defendant perceived the plaintiff to have, (2) the defendant engaged in "violence" or "intimidation by threat of violence," and (3) the defendant acted with a "discriminatory motive."  (Civ. Code, § 51.7; *Gabrielle A. v. County of Orange* (2017) 10 Cal.App.5th 1268, 1290-1291 (*Gabrielle A.*); CACI Nos. 3063, 3064.)

Both the Bane Act and the Ralph Act require proof of (1) violence, (2) threatened violence, or (3) intimidation through physical acts or words.  (Civ. Code, §§ 52.1, 51.7.)  A threat of violence requires "some expression of intent to injure or damage [the] plaintiff[] or [her] property."  (*Ramirez v. Wong* (2010) 188 Cal.App.4th 1480, 1486-1487; Civ. Code, § 52.1, subd. (j).)  Intimidation and coercion are terms of art under the Acts, reserved for "egregious interferences with constitutional rights, [and] not just any tort" such as assault.  (*Julian v. Mission Community Hospital* (2017) 11 Cal.App.5th 360, 395; *Shoyoye*, *supra*, 203 Cal.App.4th at pp. 960-961 [detention of plaintiff insufficient].)  Speech that does not explicitly threaten violence is not actionable as intimidation or coercion unless the plaintiff "reasonably fears that, because of the speech, violence will be committed against them or their property" by the defendant and that the defendant has the present ability to carry out that violence (Civ. Code, § 52.1, subd. (k); *Gabrielle A.*, *supra*, 10 Cal.App.5th at pp. 1289-1290.)  In this situation, the question is

whether "'a reasonable person, standing in the shoes of the plaintiff, [would] have been intimidated by the actions of the defendant and have perceived a threat of violence.'" (*Winarto v. Toshiba Am. Electronics Components, Inc.* (9th Cir. 2001) 274 F.3d 1276, 1289-1290 (*Winarto*).)

We independently agree with the trial court that plaintiff's Bane Act and Ralph Act claims fail as a matter of law. It is undisputed that neither McNamara nor Joseph engaged in violence toward her. It is also undisputed that neither McNamara nor Joseph ever threatened violence because at no point did either of them express an intent to injure plaintiff or her property. There is also insufficient evidence as a matter of law to establish that McNamara or Joseph ever intimidated or coerced her in a manner that would make a reasonable person perceive a threat of violence. To be sure, McNamara raised his voice, used profanity, and invaded plaintiff's personal space, but he never balled a fist, pounded a table, or did anything physical to create a reasonable belief that the "anger" and "hostility" plaintiff perceived would translate into violence. And, to be sure, Joseph made foul and offensive sexual remarks that alluded to sexual conduct to which plaintiff would not have consented, but Joseph also never touched plaintiff and never indicated he would engage in nonconsensual sexual conduct, so his conduct and words would not have caused a reasonable person to perceive a threat of violence.

Plaintiff responds with what boils down to four arguments.

First, plaintiff argues that Joseph is a lawyer, and that lawyers are more intimidating because they (ostensibly) know the law and what they can get away with. We decline plaintiff's

28

invitation to create a separate, more plaintiff-friendly standard of liability for defendants who happen to be lawyers.

Second, plaintiff argues that she subjectively felt intimidated. We must credit her evidence of such, but the definition of intimidation turns on a reasonable person, not on subjective perception.

Third, plaintiff argues that precedent compels a ruling in her favor. It does not. She cites *Winarto, supra*, 274 F.3d 1276, but the defendant in that case kicked the plaintiff and then "feigned kicking her on many other occasions" (*id.* at pp. 1289-1290). Such actual use of violence and threatened re-use of violence is absent here. Plaintiff also cites *Harris v. Stampolis* (2016) 248 Cal.App.4th 484, *Long v. Valentino* (1989) 216 Cal.App.3d 1287, *Myers v. Trendwest Resorts, Inc.* (2007) 148 Cal.App.4th 1403, and *C.R. v. Tenet Healthcare Corp.* (2009) 169 Cal.App.4th 1094. But none of these cases involves the Bane Act or Ralph Act, or their specific requirement of violence, threatened violence, or intimidation/coercion. *Long* involves the Unruh Civil Rights Act (Civ. Code, § 51 et seq.), *Myers* involves sexual harassment under FEHA, and *C.R.* involves common law sexual harassment. (*Long*, at p. 1290; *Myers*, at p. 1425; *C.R.*, at p. 1112.) *Harris* involves the civil harassment statute (Code Civ. Proc., § 527.6); while that statute requires a "credible threat of violence," it defines that term of art more expansively than the intimidation/coercion requirement under the Bane Act and Ralph Act because it need only "'place a reasonable person in fear for . . . her safety'" rather than perceiving a threat of violence. (*Harris*, at p. 498; Code Civ. Proc., § 527.6, subd. (b)(2).)

Fourth and finally, plaintiff argues that McNamara's and Joseph's words and conduct were intimidating when viewed "in

29

context." Although we agree that context is important (*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1250, disapproved on other grounds by *Cohen v. Superior Court* (2024) 102 Cal.App.5th 706, 727, fn. 11), we have already accounted for context in examining what a reasonable person in plaintiff's shoes would perceive.

## DISPOSITION

The judgment is affirmed. Defendants are entitled to their costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.

HOFFSTADT


We concur:


_____, P. J.

LUI


_____, J.

CHAVEZ